I'd like to reserve approximately a minute and a half for rebuttal if necessary. Yes. Please watch your own time. Thank you. There are several issues before the Court. They're well briefed. I won't rehash most of them. I will point out, though, that I think one of the problems in this case is that perhaps the district court was a little too precipitous in denying relief and not examining some of the materials here. One of the issues we raised in the briefing, and we asked this Court to consider, is whether or not the case should be remanded for hearing. And one of the reasons I'm sorry. Hearing as to what? I'm sorry. An evidentiary hearing as to trial counsel's effectiveness, the substantive issue in the case. Specifically what? There was a hearing on the motion for a new trial, so specifically what? There was a hearing, but there were several things that the hearing did not allow, and I think I've detailed them in the briefing. One, they were Mr. Jones was not allowed to question his trial counsel about the false entries on the diary. He was not allowed to question his counsel about what information the counsel reviewed in making her decisions. I think that that's a glaring deficiency in the hearing below. When trial counsel is up there and saying I performed effectively, they should be asked, well, what did you review when you made your decision? And this was in the context of whether or not the victim's testimony was, in fact, consistent. She said I had reviewed discovery saying that the victim's story was consistent. Well, it's glaringly inconsistent. And she's asked, well, what were those materials? And that inquiry was not permitted. That was odd. Was there a reason given? There was no reason given. She was not asked to explain how she could have absolutely no understanding of what false memory syndrome is, and then on the one hand, and then say on the other hand that she was familiar with a case that talks about it, whether she was familiar with it in the media or whether or not she was familiar with having studied the issue. She said what she did. She said she consulted with somebody, and there was just a verbal dispute about what you called it. Well, I think it's more than that. She consulted with somebody about whether or not such memories can occur. And that's not the issue in the case. They can occur, they can occur. The question is whether or not those are reliable memories. That's the question. She didn't say to her expert, hey, I have all this material about this inconsistent testimony from this victim. Does that mean that this is a reliable memory or an unreliable one? And how do we look at that? How do we judge that? What tools do we use? There was none of that kind of inquiry here in this case. There was nothing at all. She consulted somebody who obviously really believes in this. I mean, she had the advantage and disadvantage of having the preliminary or a very extensive preliminary injunction transcript. She knew how Stephanie performed on which was pretty well, actually. And she knew what she was saying about her memory, which really wasn't that it was repressed. So what was the point of pursuing that? Well, I disagree with the statement that the memory was not repressed, because I know the district court opinion in a footnote says that there's that theory out there, and Respondent moves on that theory in their briefing, and the district court even went a little bit further with it. But that's not accurate. The testimony at the preliminary hearing was that this was a recovered memory. But, you know, the testimony, I think, belies that. What the girl said was, in effect, that she was afraid to talk, not that she didn't know what had happened to her. That was the testimony at trial. That was there's a difference between what went on at trial and what went on in the preliminary hearing, and I think that that's important. In the preliminary hearing, what she appeared to be saying was, look, I was very And I sort of put it out of my mind. And as I got older, I thought about it and I realized what had actually happened. That's what I understood her to say. Well, I respectfully, I disagree. I just don't think the record supports that. I think on several occasions she said, I had forgotten about it, I didn't recall it. I forgot about it in a casual way, but not I couldn't have recalled it had I tried. I just didn't bother thinking about it. Well, I don't think that we – I don't think that it went any further than that, because, of course, nobody even asked her about it later at trial when her testimony started to alter in some significant respects. In seeing this material, I just have a big problem that I'm not sure what this would have gotten her in the end, going down this road as opposed to the other. And even recognizing this contradiction you make, it seems to me it would have been a much easier way and a road for the prosecution in some ways. Well, the road for the prosecution was made very easy by the defense in this case. The defense basically put on a defense that was consistent with its expert testimony. And I don't know why they did that, because it didn't exist until the defense put on its witnesses. But the expert testimony, and that's very shaky testimony. A lot of courts have recognized that it's very shaky testimony, and for good reason. That expert testimony was in some ways rebutted by the prosecution's evidence. But trial counsel comes along, not understanding any of the scientific nature of that kind of testimony, not understanding how it's playing out in the case, and just puts evidence that supports the prosecution's case. The prosecution had a field day with that in closing argument. Such as what? Well, such as that Stephanie had some sexually bizarre behaviors or spoke about sexual occurrences in a way that a person her age should not speak of them, things of that nature. I mean, if it was really trial counsel's idea, trial counsel should have looked at this type of evidence, and they didn't. Now, the trial counsel did consult with somebody on memory and whether or not that can occur. Trial counsel did not consult with somebody on the child sexual abuse accommodation syndrome, and she admitted that at the evidentiary hearing. And I think if trial counsel had done that, basic step, which a lot of courts recognize as a basic step when you're facing these types of cases, I think a whole world would have opened up to trial counsel that she was completely ignorant about. And that, I think, is the fundamental problem here. And when we're looking at trial counsel's testimony, we have to remember and be a little worried about sort of post hoc rationales for trial counsel's actions here. To come back and say, for instance, I didn't want to present any further testimony about the Idaho allegations. Well, the Idaho allegations were out there from a number of witnesses, including the defense's own witnesses. So I, you know, I don't really understand where that comes from. I mean, I — You never specific. They were sort of vague in general. No, I didn't think it really wasn't a great leap for a jury to understand what all these witnesses were talking about. I mean, the testimony was pretty clear when she was in Idaho, when she was in California, when these allegations pertained to, when they didn't. I mean, the information was already there before all the jurors. I think, what, four or five witnesses testified to it. And at that point, at that point, trial counsel's standing there saying, hey, there's this piece of evidence out there that can really help my client, that these allegations are restricted initially to a particular locale, and then they move to this locale as a result of some coaching of the victim. Well, that's pretty good, pretty good evidence, pretty good cross-examination that trial counsel didn't even realize was available to her at that point. I mean, all she saw was Idaho. I think the system was false memory, though, probably. I mean, in other words, it seems to me that the real question here is not the false memory. It's as between she made up the whole thing for malicious reasons or her mother's malicious reasons, or she made up some of it. I mean, those are the two possibilities. But not that she, because all the information about the fact that first it was in Idaho and then it was in California and the issue about the diary and all that, none of it points to somebody who was having recovered memory. It points to some degree of fabrication. The lawyer chose sort of small fabrication instead of big fabrication, and that really was her choice. Well, the lawyer chose out of ignorance, though. The lawyer chose not understanding what the big fabrication was that was out there for the lawyer to use. And so when we're looking at whether or not counsel's actions or decisions were reasonable, you have to do this investigation in these cases. I mean, you look at the — To investigate what now, specifically? You have to investigate the nature of repressed memory, the nature of — I'm sorry, but that's not the — but what I think we all seem to think is that that was not the strong suit. The strong suit, if there was one, was big fabrication. Well, there certainly was a lot of evidence of big fabrication. Whether or not it's an issue of a false memory or not — What should she have investigated as to that, that she didn't investigate? Well, we had all that stuff at the preliminary hearing. I see my time has run out, but I'll answer the Court's question anyway. She had all that stuff available at the preliminary hearing, all the material about how the allegations had been altered in significant ways in relationship to events in the litigation. It's not just, oh, I thought of this and then it changed to this. It's that the victim is being reminded and instructed to how the litigation has to proceed in order to get a certain result, and then those allegations are changing to reflect that. I think that's very, very powerful evidence for a jury that was initially hung. And so I think that that is very significant evidence that could have been presented. Thank you very much. Thank you. We'll give you a minute, Roberto. Good morning. May it please the Court. John Vance, Deputy Attorney General for Respondent. We often hear in these cases regarding ineffective assistance of counsel that there's more than one way to try a case. And the courts use this in abstract and in discussing it and then go on and talk about what happened in the particular case. Well, in this case, we have proof that that is indeed the case, because as everybody has recognized, the State Court of Appeals and the district court, there was more than one way to try this case. But what we have here in this case that we don't have in also in a lot of cases is a record, a record of why trial counsel did what she did. Well, the record does have a big hole. Why didn't the trial court allow any discussion of what it was that she reviewed in discovery that caused her to conclude that Stephanie was, in fact, molested? I mean, that's key. And for some reason, we don't know it. The record doesn't explain. The trial court never explained its reason. We don't know the reason from the trial court itself. It is a little unclear why one would come to that conclusion. There was no physical corroboration of her story, which would be the main reason to do something like that, right? But there wasn't any. Is that right? That is correct. So where did she get the conclusion that it was so clear that this girl was, in fact, molested that there was no way to attack that allegation? Because as she testified, Stephanie was clear that she had been molested. And she is always clear that it was the defendant that molested her. But she said it was partly because of the discovery material, or she said it was discovery materials. What discovery materials demonstrate that Stephanie was molested? Well, I think we have at least we know it's, you know, that was never explained as to what it was. I think we can talk about common practice if there's discovery material, like police reports, statements that the victim made. Very simply, by the time trial counsel got this case, she had the preliminary hearing transcript, which she said she reviewed. So by the time trial counsel got the case, and this is what's so terribly significant and what makes Yarborough v. Gentry's double-deference standard so particularly applicable here, trial counsel knew that there was another theory. Why did she know that? Not because of some abstract view that maybe there's more than one way to try a case, but because she talked to the attorney who handled the prelim. And then, based upon her review of the record and consulting a person who, in her judgment, was an appropriate person to consult, concluded that this testimony was reliable, that, you know, you can have recovered numbering. Then what we had in this case, and again, what makes Yarborough v. Gentry such an easy — I mean, the call on this case under Yarborough v. Gentry really, I believe, a very easy call for this Court, is that then we have a new trial motion where the attorney who is the proponent of the rejected theory, you know, brings the trial attorney in, and we have a whole hearing where the focus is, you know, why didn't you do, you know, what I should have, you know, what I think should have been done? And trial counsel gave answers. It went through her state of, you know, her reasoning, her thoughts. Yes, the trial court sustained an objection there, but I don't believe that that is the determinative factor either as to whether the state court was reasonable or whether there should be an evidentiary hearing, to the simple fact that when this Court looks at the entire record, the issue becomes, was trial counsel's decision reasonable? Not whether it was the only possible defense, but whether it was reasonable. And it was under this — I mean, you know, there were three — it's not just two. There were three, really, possible defenses. I think in the end, she probably chose the only one that could work, but still the fact that, you know, this wasn't addressed completely makes me a little bit uncomfortable in the sense that you're talking about a one-on-one case with a serious kind of crime, and, you know. I mean, as I said in my earlier question, I'm not — to the defense counsel, I'm not sure where it would have gotten in light of the other evidence in the record. But, you know, it's just a little disturbing that that question wasn't completely filled out. And if I could address the Court's concern, I think when you read the entire examination and the cross-examination and the redirect examination, the clear — it's clear as to this idea of reliability that, you know, I believe she said it was always consistent that, you know, these events happened. Now, we get into this other — I agree with you. I'm not sure that anyone could have done any better than what this counsel did. But I would — Okay. Excuse me. I'm sorry. No. But I think from trial counsel's point of view, there's another fact that we have to get directly out, which I believe the Court might be alluding to. I'm not sure. And that is what she knew that the defendant had told the police. The defendant told the Lake County detective that the victim was the aggressor. And the defendant told the Lake County detective that the victim was the aggressor. And the defendant told the Lake County detective that the victim was the aggressor. You know, he admitted a problem and that he wanted to get therapy for his problem. So the question becomes, as the Court asks, well, what's going to — you know, what difference does it make? And the defendant was right.  And the defendant said, well, it was at least ambiguous and it was — they did try to explain what he meant, right? It was — it wasn't a confession in the sense that the defendant said, yes, you know, she's right, I did it. The victim was the aggressor. And we're talking here a victim who is not — you know, this is not a date rape situation. I mean, this is a 12 — I forget how old the girl was. But, I mean, we're talking about a young girl and he's blaming the young girl as the aggressor. He says he's got a problem and that he wants treatment for his problem. I think there is no — under the record here, I go back to seeing my yellow light come up, that under Gentry's double deference standard for errors such as — or claims such as this. I know what you mean by double deference standard. You mean because it's Strickland and then there's on top of it? Is that what you're saying?  So I don't know that it's a double deference standard. Unless the Court has any particular questions of me, I would submit. Thank you very much. Thank you very much. Give me one minute in rebuttal if you have any. I just wanted to point out one thing about the statement that Mr. Jones has alleged to have made to the police. He denied certain aspects of it. He said there was a misunderstanding between him and the officer on it. What trial counsel didn't present, and I think it's pointed out in the supplemental excerpts of record that was submitted by a respondent here, was that the problem that Mr. Jones was referring to in the tape-recorded statement, there's a tape-recorded interview earlier with the victim's mother, was the allegations of molestation, which he believed were false, and that that's why they needed counseling. So I think there is evidence out there that, of course, it was not presented because trial counsel was not on the ball on that one either. When we're talking about deference ---- You don't know that. Well, the statements in the record ---- I'm sorry. For the very reason I'm concerned the other way, you don't know that and what she learned from her client. I agree that we don't know what she reviewed and what she based her decisions on. And she wasn't allowed to testify as to why she thought that there were any ---- there was any problem impeaching Stephanie given her defense. That was another question the trial court wouldn't allow at the post-conviction hearing. That's a central question in the case. Thank you. Thank you very much. Thank you, counsel, for your useful argument.
judges: B. Fletcher, Berzon, Trager